SHABI Z. HUSSAIN,                             )
                                              )      No. 12 C 7693
                    PLAINTIFF,                )
                                              )
        v.                                    )      Judge Thomas M. Durkin
                                              )
FEDERAL EXPRESS CORPORATION,                  )
                                              )
                    DEFENDANT.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Shabi Hussain has sued her employer, defendant Federal Express Corporation ("FedEx"), for alleged sex and national-origin discrimination in violation of Title VII. *See* R. 1. Specifically, Hussain claims that her supervisor failed to promote her in October 2010, and gave her lower discretionary bonuses than other employees, because she is a woman of Indian descent. *Id.* ¶¶ 46, 52. FedEx has moved for summary judgment, arguing that the process the company used to fill the position Hussain sought, and the outcome of that process, belie her discrimination claim. It also argues that Hussain has failed to develop a sufficient factual and legal record regarding the discretionary bonuses. For the following reasons, the Court grants FedEx's summary judgment motion.

## BACKGROUND

On July 2, 2013, the Court dismissed as time barred Hussain's Title VII claims based on employment actions that occurred prior to June 8, 2010. R. 42 at 7.

The Court held, however, that she could rely on events occurring before that date to support her timely failure-to-promote and discretionary-bonus claims. *Id*. So, the Court will examine the entire record to determine whether Hussain has established triable issues regarding her timely claims.

## I.     Pre-October 2010 Facts

Hussain began working for FedEx in 1996 as a "handler" in Chicago. R. 117 ¶ 4. FedEx promoted her to Operations Manager in 1999, a position she still holds. *Id*. FedEx generally assigns employees to a particular station within a geographic region or district. *Id*. ¶ 5. Operations Managers are responsible for hiring and managing the front-line employees (handlers and couriers) at their station. *Id*. They report to Senior Managers, who in turn report to Managing Directors, who oversee multiple stations within their region. *Id*. FedEx stations have a three-letter "call code" (*e.g.*, "GYY"), and high-volume stations are divided into a.m. and p.m. shifts (*e.g.*, "GYY-AM" and "GYY-PM"). R. 116 at 6 n. 2.

In 2007, Hussain was working in the Chicago Metro Region at the JOT station with two other Operations Managers, Gail Mazique and Kevin Colton. R. 117 ¶ 6.[1] In or around October of that year, George Truesdale became Managing Director of the Chicago Metro Region. *Id*. ¶ 7. There were two open Senior Manager positions in the region at that time, BDFA-PM and JOT. *Id*. Hussain was one of 16 candidates who applied for the BDFA-PM Senior Manager Position (four women

---

[1] All employees mentioned in this opinion, other than Hussain, are non-Indian.

and 12 men). *Id.* ¶ 8. Truesdale and Rick Connolly, another Managing Director, interviewed two applicants—Sara Walker and David Kirby—both of whom were already Senior Managers. *Id.* ¶ 9. Walker was selected for the position. *Id.*[2]

The Court infers from the record that Hussain also applied for the JOT Senior Manager position. *See id.* ¶ 10. That position was "reposted" in November 2007 "with a waiver" of FedEx's "Time in Commitment" requirement. *Id.* The company's "Career Opportunity" policy requires "exempt" employees to have 18 months in their current position before applying for positions outside their department/station, subject to certain exceptions. R. 107-8 at 20-21. FedEx contends that, on November 27, 2007, it notified all the prior applicants (including Hussain) that they should contact Truesdale and Charlotte Randolph, his administrative assistant, if they still wanted to be considered for the position. R. 117 ¶ 10; *see also* R. 108-4 at 7 ("inter-office memorandum" addressed to Hussain stating that the company had reposted the JOT position with a waiver). Hussain denies that she ever received such a notice. R. 117 ¶ 10. Truesdale and Sharron Smith, a Human Resource ("HR") Advisor, interviewed Cassandra Burkett, who had previously

---

[2] Hussain disputes FedEx's contention that Walker received a higher interview score than Kirby because Truesdale's score sheet is incomplete. R. 117 ¶ 9. Truesdale wrote down an "Interview Questions" score for Walker, but not an "Interview Presentation" or overall score. R. 108-3 at 2. Hussain points out that Truesdale gave Kirby a higher overall score than Connolly did (76.5 versus 68, respectively). R. 117 ¶ 9. On the other hand, Truesdale rated Walker's responses to interview questions higher than Connolly did (45 versus 35.5, respectively). *Compare* R. 108-3 at 2 *with id.* at 15. The Court discusses the mechanics of the interview process in more detail later in this opinion. *See infra.*

applied for the position, and Don Mock. *Id.* ¶ 12. Mock received the highest score and was selected for the position. *Id.*

In April 2008, Hussain and her husband—also a FedEx employee—transferred to New York. *Id.* ¶ 14. After working as an Operations Manager in New York for approximately one year, *id.* ¶¶ 14-15, 17, Hussain began reviewing her options to return to Chicago for family reasons. *Id.* ¶ 15. In or around July 2009, Hussain applied for a BDF-AM Operations Manager position in Hillside, Illinois, and a GYY-PM Senior Manager position in downtown Chicago. *Id.* ¶ 17; R. 126 ¶ 5. Sharron Smith, who as a member of FedEx's HR department was responsible for determining whether candidates satisfy the time-in-department requirements, told Hussain that she was not eligible to apply for those positions because she had not spent 18 months outside of Chicago. R. 117 ¶ 17. Hussain contacted Smith's supervisor, Albert Shenouda, who confirmed that she could not apply for the Chicago positions because she had not satisfied the 18-month time-in-department requirement. *Id.* ¶ 18.[3] Shenouda and Smith encouraged Hussain to apply for a

---

[3] Hussain contends that Shenouda and Smith incorrectly applied the time-in-commitment requirement because she was eligible for an exception that applies when "the previous job change was made at management's request or was the result of a reorganization. Management's request is defined as the reassignment of an individual from his currently held position." R. 107-8 at 21; R. 116 at 21. As the Court understands her position, Hussain contends that she was eligible for the exception because at some point in 2009 her Managing Director in New York transferred her from the WTCA station to the FIDA station (also in New York). R. 116 at 21. This is not an obvious application of the rule given the fact that 18 months had not elapsed since Hussain's last *voluntary* transfer. In any event, there is no evidence that Truesdale, the relevant decision-maker with respect to her timely Title VII claims, had anything to do with the HR department's decision.

"hardship transfer," which would allow her to be considered for a lateral transfer to Chicago (but not a promotion to Senior Manager). *Id.*[4] Truesdale ultimately hired Rick Miglans for the GYY-PM Senior Manager position. *Id.* ¶ 21.

FedEx approved Hussain's hardship transfer to Chicago in or around August 2009. *Id.* ¶ 19. Truesdale assigned Hussain to an open Operations Manager position, GYY-AM, in downtown Chicago. *Id.* In connection with her hardship transfer, however, the company allowed Hussain to interview for the BDF-AM Operations Manager position. *Id.*; *see also* R. 126 ¶ 9. The GYY-AM position paid 5% more than the BDF-AM position, but the parties agree that less busy suburban locations (like BDF) are generally more sought after. R. 117 ¶ 19; R. 126 ¶ 6. Truesdale played no role in FedEx's decision to award the BDF-AM position to Robert Smith. R. 117 ¶ 19.

In or around April 2010, a BDF Senior Manager position became available. R. 117 ¶ 22; R. 126 ¶ 10. After interviewing seven candidates (all men), FedEx hired Steve Franzese for the position. R. 117 ¶ 22. Hussain contends that she did not apply for the job because Glen Girtman, her supervisor, told her not to bother applying because Truesdale was going to give the job to Franzese. R. 126 ¶ 10.

---

[4] In an email to Shenouda, Truesdale said that he believed Hussain was "not ready" for the Senior Manager position. R. 126 ¶ 7. Shenouda responded that she was not eligible for the promotion because her hardship transfer did not override the time-in-department requirement with respect to positions constituting a promotion. *See* R. 118-5 at 1 ("As far as the SM, the hardship could not help her any way because she does not meet time in dept requirements and the [h]ardship exception does not allow for promotion.").

In or around September 2010, Truesdale announced that Girtman was leaving GYY. *Id.* ¶ 11. Truesdale moved Miglans from his GYY-PM Senior Manager position into the AM position that Girtman had vacated. *Id.* He also announced that John Griffith, an African American who was then a GYY-PM Operations Manager, would be the interim GYY-PM Senior Manager until the position was permanently filled. *Id.* Griffith testified that he was the only person who volunteered for the interim position when it was announced at a meeting of GYY-PM managers. *See* R. 117 ¶ 44.[5] The interim position was intended to "streamline communications during the absence of a Senior Manager," and did not entail any additional pay. *Id.* ¶ 45. In that role, however, Griffith was responsible for forwarding information directly to Truesdale. *Id.*

## II.    The GYY-PM Senior Manager Opening

FedEx posted the GYY-PM Senior Manager position in October 2010. *Id.* ¶ 23. One current Senior Manager (Tom Hucher), and ten Operations Managers (including Hussain), applied. *Id.* ¶ 25; *see also* R. 118-12. Michael Rodriguez, an HR Advisor, recommended that the company interview Hucher and four unidentified Operations Managers. R. 117 ¶ 24; R. 126 ¶ 15. Hussain contends that it was

---

[5] The back-and-forth between Griffith and defense counsel on this subject during Griffith's deposition is not as clear as it could be. *See* R. 107-14 (Griffith Dep.) at 25-32. He clearly testified, however, that at a meeting with Miglans and the PM Operations Managers he (Griffith) was the only person who volunteered for the interim position. *Id.* at 31. Hussain's denial that Griffith volunteered for the position is contrary to the evidence. *Cf.* R. 117 ¶ 44 ("Plaintiff denies that Griffith volunteered for this position because he could not specifically recall communicating that he wanted to serve as Interim Senior Manager.").

FedEx's custom and practice to interview the top five or fewer candidates based upon past performance reviews and general eligibility requirements. *See* R. 117 ¶ 24. She has not, however, cited any admissible evidence supporting this contention.[6] Indeed, Truesdale interviewed all seven applicants for the BDF Senior Manager position that Franzese received in March/April 2010. *Id*. ¶ 22.[7]

After Hucher and another candidate withdrew their applications, Truesdale chose to interview the nine remaining candidates: Griffith, Hussain, Michael Phillips, Robert Smith,[8] Steve Strong, Regis Frazier, Roy Isaksen, Lori Piazzi, and

---

[6] The portion of Rodriguez's deposition that Hussain cites does not support her characterization of FedEx's usual practice. *See* R. 107-10 (Rodriguez Dep.) at 56 (discussing the makeup of the interview panel); *see also* R. 118-12 (Rodriguez stating in an email to Truesdale's administrative assistant that Rodriguez "recommend[ed]" interviewing five candidates). Hussain also cites inadmissible hearsay that she attributes to Sharron Smith. *See* R. 126 ¶ 15.

[7] Rodriguez prepared a pre-interview ratings grid, possibly to winnow the candidates down. R. 126 ¶ 15. Hussain has attached to her Rule 56.1 statement three charts that appear to show performance ratings for the eleven candidates for the GYY-PM Senior Manager position. *See* R. 118-13. One of the charts lists seven "candidates to interview" including Hussain (but not Griffith), *id*. at 2; another chart lists nine "candidates to interview" including both Hussain and Griffith. *Id*. at 3. Even assuming that the charts are admissible evidence, *cf*. R. 126 at 16 (arguing that Hussain has failed to establish an adequate foundation for the charts), they are immaterial. It is undisputed that Truesdale had discretion to interview all the applicants for a given position, R. 117 ¶ 24, and there is no evidence that the charts played any role in FedEx's hiring decision.

[8] Smith did not satisfy the time-in-department requirement, but FedEx allowed him to interview for the position. R. 117 ¶ 61. Kendy Kallaher, the HR Advisor assigned to investigate Hussain's discrimination complaint, later concluded that Smith was eligible because he was applying for a promotion within the same department/district. *Id*. Hussain denies that Kallaher accurately interpreted FedEx's policy. *Id*.

Wallace Loney. *Id.* ¶ 25. Truesdale chose three interview panelists, in addition to himself: Rodriguez (HR - GYY), Miglans (Senior Manager - GYY), and Marc Morris (Senior Manager - NBU). *Id.* ¶ 26; R. 126 ¶ 17. At that time, FedEx policy did not prohibit appointing Senior Managers to the interview panel for Senior Manager positions. R. 117 ¶ 27. Truesdale also appointed Senior Managers to the interview panels for the August 2009 and April 2010 Senior Manager openings. *Id.* After investigating the interview process in this case, FedEx instituted a policy prohibiting the practice. *Id.*; *see also* R. 126 ¶ 19.

During the interviews, each candidate delivered a PowerPoint presentation describing what he or she would accomplish within the first 30, 60, and 90 days if hired as the GYY-PM Senior Manager. R. 126 ¶ 20. They also each answered the same six interview questions:

> (1) Tell me about a time when you had to make a decision that was not popular with one or more people that you worked with. (2) Tell me about a time that there were so many demands at work that you were not able to give 100% to everything that you had to do. (3) Tell me about a time that you were part of a team that did not work together as well as it could have. (4) Tell me about a time when you made an extra effort to get employees in your group to buy into workgroup or project goals. (5) Describe how you have improved your areas of opportunity as identified by your employees on your SFA. (6) In today's environment, how do you balance our PSP philosophy AND focus on productivity improvements? What percent of your time do you devote to each and what steps are you taking to ensure you and your managers accomplish your goals?

R. 117 ¶ 29. These questions corresponded to the following scoring categories: (1) "Resolving and Avoiding Conflict"; (2) "Adaptability"; (3) "Teamwork"; (4) "Leadership"; (5) "Self-Development"; and (6) "Communicating Corporate PSP." *Id.*

¶¶ 29-30. For each of the six questions/categories, the panelists rated the applicants using a five-point scale (maximum 30 points). *Id.* ¶ 30. The panelists separately rated the applicants' PowerPoint presentations on a five-point scale (multiplied by four, with a 20-point maximum), for a total possible score of 50 points. *Id.*

After interviewing the candidates, the panel members discussed their notes and scores for each applicant and ostensibly reached a "consensus" score. R. 126 ¶ 21.[9] The panel ranked the applicants as follows: (1) Phillips, 30; (2) Griffith, 27; (3) Smith, 26; (4) Hussain, 24; (5) Strong, 24; (6) Frazier, 24; (7) Isaksen, 22; (8) Piazzi, 19; and (9) Loney, 17. R. 117 ¶ 32. Truesdale, individually, gave Hussain a 23.5 (*see* R. 107-5 at FED EX 00904), below his scores for Phillips (27, *see id.* at FED EX 00868) and Griffith (24.5, *see id.* at FED EX 00936), but higher than his scores for other candidates. R. 117 ¶ 36.

After Phillips emerged as the highest scoring applicant, Truesdale contacted Jim Malone, the Managing Director of the St. Louis area where Phillips worked. *Id.* ¶ 37. Malone told Truesdale that Phillips was a good manager, but he did not have experience working in a large station like GYY, one of FedEx's largest and busiest

---

[9] Hussain argues that "the score sheets for the interview[s] are highly irregular." R. 117 ¶ 32; *see also* R. 116 at 6. She contends that some "consensus" scores are actually averages of the individual panelists' scores, whereas other scores were agreed upon independent of the panelists' individual scores. R. 117 ¶ 32. But Hussain does not argue that the asserted irregularities, if corrected, would have produced a different outcome. She points out, for example, that someone crossed out her "consensus" score for Self-Development ("4") and changed it to "3." *Id.* She also contends that Griffith received an extra point for his presentation that he should not have received. R. 116 at 9. Giving Hussain an extra point, and taking a point away from Griffith, would not have changed the result.

stations. *Id*. ¶ 38.[10] On November 8, 2010, Truesdale offered the GYY-PM Senior

Manager position to the next highest-scoring applicant, Griffith. *Id*.; *see also* R. 126

¶ 24. Unlike Phillips, Griffith had worked for years as an Operations Manager (P.M.

shift) at a large station, CGX in Chicago. R. 117 ¶ 39. Also, his status as a minority

(African American) was considered a plus "in light of FedEx's affirmative action and

diversity efforts." *Id*. ¶ 40; *see also* R. 126 ¶ 22 ("Truesdale did not rely solely on

interview scores, but considered 'other items' in making his hiring decision.").

Hussain was again passed over for promotion. There is no evidence in the record

that Truesdale promoted any female Operations Managers to Senior Manager

during his tenure as Managing Director (from 2007 until his retirement in 2010).

*See* R. 126 ¶ 1; *see also id*. ¶ 29 (Hussain's colleague, Gail Mazique, "felt there was a

'brick wall' for female managers trying to get promoted to upper management").[11]

---

[10] Hussain contends that Malone's statement about Phillips is inadmissible hearsay. R. 117 ¶ 38. The Court disagrees. FedEx has not offered the statement to show that Phillips did not have large-station experience. Rather, it is to show Truesdale's motive for not awarding the position to the highest-scoring candidate. Hussain could have deposed Malone to test Truesdale's statement, but she did not do so.

[11] Truesdale was on the interview panel that chose Sara Walker over David Kirby in 2007, but Walker was already a Senior Manager at that time. R. 117 ¶¶ 8-9. He was on the interview panel that selected Paula Tharber as Senior Manager, but Tharber worked at that time in a different district under a different Managing Director. *Id*. ¶ 13; *see also* R. 107-3 (Truesdale Dep.) at 126-28. She only later became part of Truesdale's district due to consolidation. R. 117 ¶ 13. And Shelia Thompson was already Senior Manager when Truesdale became Managing Director in 2007. R. 107-3 (Truesdale Dep.) at 128-29.

### III. Hussain's "Feedback" Meeting

On November 16, 2010, Hussain met with Truesdale to discuss her interview. R. 126 ¶ 24. During the meeting, Truesdale brought up Hussain's performance at two "guaranteed fair treatment" ("GFT") meetings. R. 117 ¶ 55. FedEx's GFT procedure gives employees an opportunity to challenge disciplinary actions taken by their supervisors. *Id*. ¶ 54. On October 8, 2010, Hussain and Truesdale participated in a GFT meeting with Fortunato Ramirez, an employee whom Hussain had terminated for disciplinary reasons. *Id*.; *see also* R. 126 ¶ 23. Truesdale overturned the decision. R. 126 ¶ 23; *see also* R. 117 ¶ 54. Truesdale told Hussain that he believed that she was "emotional" during the hearing.[12] R. 126 ¶ 23. According to Truesdale, she set an "I'm right, you're wrong" tone, and did not remain neutral, low-key, and diplomatic. *Id*. After other GFT hearings, Truesdale told Hussain that she came across "too aggressively and emotional." *Id*. ¶ 55; *see also* R. 126 ¶ 26. At the feedback meeting, Truesdale told her that she should be "more Indian," "more stoic," and "expressionless." R. 117 ¶ 55. Hussain replied that she *was* Indian, after which Truesdale told her to be more like "an American Indian." *Id*. Hussain denies

_____

[12] The timing of Truesdale's statements to Hussain are somewhat unclear. In her response to FedEx's Rule 56.1 statement, Hussain admits that before interviewing for the GYY-PM position, Truesdale "had never made any direct comments to her that were derogatory based on her gender [or] national origin; however Plaintiff denies the same for after the interview process." R. 117 ¶ 41. In her statement of additional facts, she states that Truesdale told her that she was "emotional" and "aggressive" during GFT meetings before she interviewed for the GYY-PM position. R. 126 ¶ 23. Construing the evidence in the light most favorable to Hussain, Truesdale criticized her performance after GFT hearings *and* during her feedback meeting on November 16, 2010.

that Truesdale's criticisms were fair or accurate, *id*., and points out that Rodriguez—who also participated in GFT meetings with Hussain—testified that he had not seen her behave in an "overly aggressive" way. R. 126 ¶ 23.

## IV. Hussain's EEO Complaint and FedEx's Internal Investigation

On November 18, 2010, Hussain filed an internal EEO complaint alleging that Truesdale did not promote her to GYY-PM Senior Manager because of her gender. R. 117 ¶ 57; *see also* R. 126 ¶ 25. FedEx assigned Kendy Kallaher, an HR Advisor, to investigate Hussain's complaint. R. 117 ¶ 58. Kallaher interviewed witnesses (including Hussain), reviewed documents, and drafted investigative findings, *id*. ¶ 59, which were reviewed by Robert Center, the Managing Director for the Virginia Commonwealth District. R. 126 ¶ 25. The company concluded that the decision to hire Griffith was not discriminatory. R. 117 ¶ 60. With respect to the "interim" or "acting" Senior Manager title that Truesdale conferred on Griffith and Miglans, Kallaher concluded that it did not give them an unfair advantage when they later applied for the position permanently. Rather, Truesdale promoted them because they scored higher during the "competitive interview process" for the permanent position. *Id*. ¶ 62.

In a letter notifying Hussain that the investigation was complete, Center stated that the "investigation did identify some practices that may be inconsistent with our policies, culture and philosophy. Appropriate recommendations were made for your management team to implement to address these practices." R. 118-26. FedEx issued Truesdale an "OLCC" for "lack of sensitivity" for his statements to

Hussain during her post-interview feedback meeting. R. 126 ¶ 28. The company also revised its employment policy to provide that only Managing Directors and HR Advisors/Managers may sit on selection panels for Senior Manager positions. *Id.*

## V. Shelia Thompson's EEO Complaint Against Truesdale and Shenouda

Senior Manager Shelia Thompson filed an internal EEO complaint against Truesdale for gender and race discrimination on October 14, 2010. R. 126 ¶ 33. According to Thompson,

> Truesdale criticized and questioned Thompson more harshly than male Senior Managers, degraded her in meetings, threatened to demote her to an Operations Manager, told her she did not have the skill set to be a Senior Manager, gave her an unwarranted performance reminder, and reassigned her secondary station to Don Mock, thereby decreasing her pay. Truesdale also called Thompson passive-aggressive at least five times and made negative comments about her facial expressions and "non-verbal communication."

*Id.* (record citations omitted); *see also* R. 118-28 (Thompson's internal EEO complaint). FedEx investigated Thompson's complaint and concluded that the evidence "did not support [her] allegations of discrimination." R. 118-29 (Investigative Report, dated Dec. 10, 2010) at 19. Instead, it attributed the events to a personality conflict between Truesdale and Thompson:

> Evidence supports that Complainant's personality is of a defensive and push back nature. Truesdale has become frustrated with Complainant. Truesdale['s] decision to issue Complainant a performance reminder was rushed and not well written or thought out. Truesdale's rationale for promoting Senior Manager, Don Mock to grade 29 that resulted in a pay increase for Mock was insensitive to Complainant's duties, and pay is not the intent of Policy 3-55 Job Evaluation and Analysis.

*Id.* In light of Truesdale's conduct, the company took the following "corrective action": (1) it issued "written counseling [to Truesdale] for allowing his frustration

13

with [Thompson] to impair his judgment when issuing discipline"; (2) it directed Truesdale to "review his processes when issuing discipline" and "include the HR Advisor, and not just the HR Manager, in the review process"; and (3) required him "to discuss any reorganizations that result in promotions, not posted in Career Opportunities, with his V.P. prior to implementing them." *Id.*

## VI.    "Bravo Zulu" Bonuses

FedEx maintains a discretionary bonus program called "Bravo Zulu" ("BZ") to recognize good performance. *Id.* ¶ 74. The company allocates an annual budget to each division, *see* R. 107-8 at 7 ("Budget"), to be distributed to FedEx employees pursuant to the program's guidelines. R. 117 ¶ 76. Managers receive a monthly budget based upon seniority (*e.g.*, Managing Directors have a larger budget than Senior Managers), which they distribute to more junior employees as they see fit. *Id.*; *see also* R. 107-8 at 7 ("Award Limits"). At some point in 2010, Truesdale gave Hussain a $50 BZ award. R. 117 ¶ 74. A male co-worker told Hussain that Truesdale gave him a $100 BZ award, and other employees confirmed that they'd also received $100 from Truesdale in the past. *Id.* ¶ 75; R. 126 ¶ 36.

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light

most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013).

To defeat summary judgment, a nonmovant must produce more than "a mere

scintilla of evidence" and come forward with "specific facts showing that there is a

genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013).

Ultimately, summary judgment is warranted only if a reasonable jury could not

return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

ANALYSIS

## I.     Failure to Promote

Under Title VII of the Civil Rights Act of 1964, an employment action is

unlawful if gender or national origin was a "motivating factor." 42 U.S.C. § 2000e-

2(m). Hussain can survive summary judgment using either the "direct method" or

the "indirect method." *Whitfield v. Int'l Truck and Engine Corp.*, 755 F.3d 438, 442

(7th Cir. 2014). Hussain utilizes both methods. *See* R. 116 at 9, 11.

### A.     Direct Method of Proof

Under the direct method, Hussain may establish a triable issue using direct

and circumstantial evidence that race and national origin motivated FedEx's

conduct. There is no direct, "smoking gun" evidence in this case. *Burks v. Union

Pac. R.R. Co.*, No. 14-2707, — F.3d —, 2015 WL 4187738, at *5 (7th Cir. July 13,

2015) (slip op.).[13] Hussain may, however, survive summary judgment by

---

[13] The Court rejects Hussain's argument that Truesdale's statements at the post-
interview feedback meeting are direct evidence of discrimination. R. 116 at 10.

"constructing a convincing mosaic of circumstantial evidence that allows a [factfinder] to infer intentional discrimination by the decisionmaker." *Whitfield*, 755 F.3d at 443. Circumstantial evidence "may include '(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.'" *Burks*, 2015 WL 4187738, at *5 (quoting *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 691 (7th Cir. 2014)). Circumstantial evidence is "convincing" if it "directly point[s] to a discriminatory reason for the employer's action" and is "directly related to the employment decision." *Whitfield*, 755 F.3d at 443.

## 1. Hussain's Experiences Before Applying for the GYY-PM Senior Manager Job

### a. *The 2007 BDFA-PM & JOT Senior Manager Positions*

---

Contrary to Hussain's argument, *see* R. 116 at 13, Truesdale did not tell her that she did not get the GYY-PM position because she was too "aggressive" and "emotional," and not "Indian" enough, during GFT meetings. Rather, she *infers* that these observations informed Truesdale's decision because he made them during her post-interview feedback meeting. *See id*. This is not direct evidence. *See Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 823 (7th Cir. 2011) ("Direct evidence is evidence that would prove discriminatory intent without reliance on inference or presumption."). Likewise, the terms that Truesdale used—"aggressive," "emotional," "assertive"—suggest discrimination (if at all) only by implication.

In 2007, Hussain applied for two promotions to Senior Manager that FedEx awarded to other applicants. *See* R. 117 ¶¶ 7-12. The circumstances surrounding those decisions, however, do not support an inference of discrimination.

FedEx interviewed two of the sixteen applicants for the BDFA-PM opening—Sara Walker and David Kirby—both of whom were already Senior Managers. *Id.* ¶ 9. Walker scored higher than Kirby, and FedEx awarded her the position. *Id.* There is nothing about this employment decision to suggest discrimination against Hussain.

With respect to the 2007 JOT opening, Hussain contends that Truesdale rigged the process to favor his "preferred candidate," Don Mock. R. 116 at 20. At least seven candidates applied for the position when FedEx originally posted it. *See id.* ¶ 10 (George Hall, David Kirby, Cassandra Burkett, Gail Mazique, Demetrius Carpenter, Hussain, and Cedric Halfacre). Neither party has explained why FedEx reposted the position with a waiver of the time-in-department requirement. Hussain argues, without citing any evidence, that Mock did not apply originally because he was ineligible for the position without the waiver. R. 116 at 20. In any event, there is evidence that FedEx at least attempted to notify prior applicants (including Hussain) that they had to reapply if they still wanted to be considered. R. 117 ¶ 10; *see also* R. 108-4. She denies that she received notice that FedEx had reposted the position, *see* R. 117 ¶ 10, but there is no evidence that the notice was not sent (or somehow misdirected) for discriminatory reasons. According to Hussain, two of the original candidates reapplied after FedEx reposted the position with a

waiver: Gail Mazique and Cassandra Burkett. *Id.* Truesdale and Sharron Smith interviewed Burkett and Mock. *Id.* ¶¶ 11-12. Mock scored higher than Burkett, and FedEx offered him the job. *Id.* ¶ 12. Again, the hiring process (and the outcome) do not suggest discrimination against Hussain.

### b. *Hussain's 2009 Transfer Back to Chicago*

Hussain contends that FedEx enforced the time-in-department requirement incorrectly upon her return to Chicago, and that it did so for discriminatory reasons. *Id.* ¶¶ 16-18, 21. Although it is not clear from the record, *see supra* n. 3, the Court will assume that FedEx misinterpreted its policy when it told Hussain that she was ineligible for the GYY-PM Senior Manager position, and told her (at least initially) that she was ineligible for the Operations Manager position at BDF. There is, however, no evidence to suggest that the HR employees responsible for that decision (including Sharron Smith) discriminated against her. Hussain suggests in her response brief that Truesdale played some part in raising the time-in-department issue because he "did not want [her] to return to the Chicago District." R. 116 at 21. Hussain's theory is contrary to the evidence. *See* R. 117 ¶¶ 17-18 (the HR department, not Truesdale, concluded that Hussain did not meet the time-in-department requirement); *see also id.* ¶ 24 (the HR department reviews job applications to determine whether the applicants are eligible for the position). Moreover, Truesdale assigned Hussain to the higher-paying (but more hectic) GYY station *in Chicago. Id.* ¶ 19.

After applying for a hardship transfer at the HR department's direction, FedEx allowed Hussain to interview for the BDF-AM Operations Manager position (a lateral transfer), but not the GYY-PM Senior Manager position (a promotion). Hussain argues that the BDF-AM interview was "largely a sham" because Truesdale had already decided to assign her to GYY. R. 116 at 22. It does not follow, however, that she could not have obtained a different position through the interview process. Moreover, Truesdale was not on the interview panel that hired Robert Smith for the BDF-AM position. R. 117 ¶ 19; *see also* R. 107-2 (Hussain Dep.) at 96 (Hussain was interviewed by Steve Condo, Jason Wroble, and Mike Rodriguez).[14]

With respect to the GYY-PM Senior Manager position, Truesdale did state that he believed that Hussain was "not ready" for the position. *See* R. 126 ¶ 7; *see also* R. 116 at 21. But Hussain effectively admits that she was ineligible for promotion as a hardship transferee. *See* R. 117 ¶ 18.

### c.    *April 2010 BDF Senior Manager Position*

Hussain argues that FedEx's decision in April 2010 to promote Steve Franzese to the BDF Senior Manager position supports her discrimination claim. R.

---

[14] Hussain contends that "no evidence exists that Robert Smith['s] [p]erformance at his interview for the BDF-AM position was superior to" hers, pointing out that FedEx did not produce interview notes regarding this hiring decision in discovery. R. 117 ¶ 21. Four FedEx employees have provided declarations stating that they were unable to locate the hiring materials after a diligent search. *See* R. 118-37. Hussain has not asked the Court to draw an adverse inference from the fact that the documents are missing, and even if she had, it does not appear that it would be warranted. *See Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002) (the mere inability to produce documents in discovery is insufficient to draw an adverse inference; rather, the employer must have acted in bad faith).

116 at 23. The Court disagrees. According to Hussain, her supervisor told her not to bother applying for the opening: Franzese was going to get the job because he had the second-highest scoring interview for the 2009 GYY-PM opening behind Miglans. *Id*. Hussain could use her supervisor's statement to show why she did not apply, but her reasons for not applying are irrelevant to the ultimate issue in this case. That statement is inadmissible hearsay if offered to show that Franzese's promotion was a foregone conclusion. Thus, it does not add anything to the direct-method analysis.

### 2. Hussain's Application for the GYY-PM Senior Manager Position

Hussain argues that Griffith's status as "interim" Senior Manager gave him a "massive advantage" over her going into the interview. R. 116 at 14. The fact that the panelists gave Phillips a higher score than Griffith belies Hussain's argument that serving as interim Senior Manager conferred a "massive advantage" over the other candidates (male and female).[15] Even assuming that it was an advantage, there is no evidence that Truesdale conferred that advantage on Griffith (or withheld it from Hussain) for discriminatory reasons. Griffith testified that he was the only person who volunteered for the position when it was announced. *See* R. 117 ¶ 44; *see also supra* n. 5. Hussain complains that the interim position was not

---

[15] The record also does not support the distinction that Hussain draws between an "acting" and an "interim" Senior Manager. According to Hussain, an "acting" Senior Manager fills in while the Senior Manager is, for example, on vacation, whereas an "interim" Senior Manager temporarily fills a vacancy. *See* R. 117 ¶ 44; R. 126 ¶¶ 8, 13. There is no evidence indicating that FedEx formally (or informally) recognizes the distinction. Hussain merely speculates that FedEx favors "interim" Senior Managers during the hiring process for the permanent position because Miglans and Griffith were "interim" Senior Managers before the company permanently promoted them.

"posted" so that she could apply, *see* R. 126 ¶ 13, but the only relevant evidence in the record indicates that FedEx does not post temporary positions. *Id.*

Turning to the interviews themselves, the evidence does not support Hussain's argument that they were suspiciously irregular. Truesdale had discretion to interview all eligible candidates, and the record concerning his decision to do so in this instance is too muddled to support the inference that he had an improper motive. *See id.* ¶ 16; *see also supra* n. 7. FedEx did not adopt a policy prohibiting Senior Managers from interviewing candidates for Senior Manager positions until after the company hired Griffith. R. 117 ¶ 27. And even if the practice was unsound, *see* R. 126 ¶ 19, the evidence does not support Hussain's argument that Senior Managers only rarely participated on interview panels or that the practice was unique to Truesdale. *See id.* (Center used Senior Managers on interview panels for Senior Manager positions, presumably before FedEx changed its policy); *see also* R. 117 ¶ 27 (Senior Managers were on the interview panels for the GYY-PM and BDF Senior Manager openings in 2009 and 2010, respectively).

With respect to the scoring, the discrepancies that Hussain highlights—if they are in fact discrepancies—are immaterial because they did not affect the outcome. *See supra* n. 9. Each applicant gave a PowerPoint presentation on the same subject, and answered the same six interview questions. There is no evidence that the panelists asked Hussain, or the other female applicant (Lori Piazzi), any additional questions, or made any comments, suggesting improper gender stereotyping. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272-73 (7th Cir.

2004) (requiring the plaintiff to show that the individuals who rated her performance, "and therefore thwarted her opportunity for promotion," intentionally gave her a lower rating because of her race or gender); *cf. Geraty v. Vill. of Antioch*, 941 F. Supp. 2d 918, 929 (N.D. Ill. 2013) (questions about the plaintiff's family responsibilities, not raised during the interviews of male employees, supported an inference of gender discrimination). Morris, Rodriguez, and Miglans all testified that Truesdale did not influence their scores. R. 117 ¶ 31. Hussain's theory that Truesdale's status as Managing Director may have swayed the other panelists, whether or not they acknowledged his influence, is speculative and not supported by the outcome.[16] Truesdale's "preferred" candidate did not receive the highest score.

Awarding the position to an employee who did not receive the highest interview score is contrary to FedEx's usual practice. *See* R. 126 ¶ 22. But under the circumstances, the company's departure from its usual practice does not support an inference of discrimination. Truesdale's testimony that Malone told him that Phillips was not ready for a large-facility position is admissible, *see supra* n. 10, and uncontradicted.[17] Even if, contrary to the record, Truesdale had no basis besides utter favoritism for not choosing the highest-scoring applicant, it still would not

---

[16] The Court respectfully disagrees with *Geraty* insofar as the court relied on speculation that the plaintiff's supervisor "could have" influenced the individuals considering plaintiff's application for promotion because he met with them "several times before and during the promotion process." 941 F.Supp.2d at 930; *cf. Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) ("inferences relying on mere speculation or conjecture" are insufficient to defeat summary judgment).

[17] At oral argument, Hussain's attorney stated that she had not deposed Malone to test Truesdale's statement regarding their conversation.

support an inference that Truesdale discriminated against Hussain. Robert Smith was the next-highest scoring candidate behind Griffith, and Hussain had the same score as Strong and Frazier. To say that Truesdale favored Griffith at Hussain's expense ignores the fact that other candidates scored as well (or better) than Hussain.

### 3. The Interview Feedback Meeting

Hussain argues that Truesdale's statements during her interview feedback meeting indicate that he expected her "to conform to the stereotype of a submissive Indian female." R. 116 at 13. "[C]ertain ostensibly neutral bases for a hiring decision may be predicated on impermissible stereotypes and biases." *Smith v. Wilson*, 705 F.3d 674, 678 (7th Cir. 2013). "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).

In support of her argument that Truesdale expected her to conform to stereotypes, Hussain relies on *Price Waterhouse* and *Geraty v. Village of Antioch*, a district court case that applied *Price Waterhouse* to facts analogous to—but ultimately distinguishable from—this case. *See* R. 116 at 13-14.

### a. Price Waterhouse v. Hopkins

In *Price Waterhouse*, the defendant solicited comments from partners regarding the plaintiff's candidacy for partnership. 490 U.S. at 233. She was praised by some, but also criticized—by proponents and opponents alike—for being "overly

aggressive, unduly harsh, difficult to work with and impatient with staff." *Id.* at 235. Besides these ostensibly legitimate criticisms, however, there were "clear signs . . . that some of the partners reacted negatively to Hopkins' personality because she was a woman." *Id.* One partner described her as "macho," another suggested that she "overcompensated for being a woman," and a third "advised her to take 'a course at charm school.'" *Id.* Some partners criticized her use of profanity, and there was evidence that they "objected to her swearing only 'because it's a lady using foul language.'" *Id.* A supporter explained that the plaintiff "ha[d] matured from a tough-talking somewhat masculine hard-nosed [manager] to an authoritative, formidable, but much more appealing lady [partner] candidate." *Id.* Finally, the partner who explained the firm's decision to place her candidacy on hold told her that "in order to improve her chances for partnership . . . [she] should 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" *Id.* The Supreme Court affirmed the lower court's decision finding the defendant liable under Title VII:

> An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.

*Id.* at 251.

### b. *Geraty v. Village of Antioch*

The plaintiff in *Geraty*, a police officer, claimed that the defendant did not promote her to sergeant because of her gender. 941 F. Supp. 2d at 920. The Village of Antioch's Board of Police and Fire Commissioners (the "Board") creates a list of

Village police officers eligible for promotion to sergeant every three years. *Id.* at 921. In 2006, the Board began the process of creating a new list after the last officer remaining on the 2003 list asked the Board to remove his name. *Id.* Twelve officers applied to be added to the new list, including the plaintiff Dawn Geraty. *Id.* The process of creating the list "consisted of three parts: an anonymous written test, a subjective oral interview, and a discretionary Department Merit and Efficiency Rating assigned by the Chief of Police ('Chief Points')." *Id.* The officers were then ranked on the list according to an overall score broken down as follows: written test result (35%); interview (35%); Chief Points (20%); and seniority/military service (10%). *Id.* The police chief at that time, James Foerster, knew in February 2006 that Geraty "wanted to be promoted to sergeant." *Id.* Nevertheless, three days before the written exam, Foerster told Geraty that he "did not even know [she] was interested in the sergeant position because he didn't think it would work out with [her] home [and] family life." *Id.* at 922. Nine candidates passed the written exam, with Geraty receiving the third-highest score. *Id.* She also had the third-highest "Chief Points," *id.* at 924, 928, although the distribution of the points was suspicious. "The Chief Points assigned by Foerster correlated with the candidates' seniority, with one exception: although Geraty had more seniority than [David] Jensen, Foerster gave Jensen more Chief Points than Geraty." *Id.* at 924.

During her interview, the Board asked Geraty "questions unrelated to her qualifications to be a sergeant, including questions about her family." *Id.* at 922-23; *see also id.* at 923 ("According to Geraty, in the middle of the interview, the Board's

secretary asked Geraty about her young daughter."). "A jury could infer that the question of family responsibilities was raised in Geraty's interview, but not during the interviews of the male sergeant candidates." *Id.* at 929. One of the commissioners testified that Geraty did not seem "ready to take on the responsibilities of . . . of other people, okay, other than herself." *Id.* She seemed less "confident" than the other (male) candidates. *Id.*; *see also id.* at 923-24 (the commissioner believed that Jensen seemed "like he really wanted to be a go-getter type guy"). Geraty received lowest interview score (70); Jensen, whom several other officers described as unqualified to be sergeant, received the highest interview score ("a near-perfect 98 out of 100 points"). *Id.* at 924. Geraty finished sixth on the final sergeant list, making her ineligible for immediate promotion. *Id.*; *see also id.* at 928 (department rules allowed the police chief to immediately promote only the top three highest scoring candidates). Jensen finished second and was one of two candidates immediately promoted to sergeant. *Id.* at 924-25.

The court held that Geraty had presented sufficient facts, construed in the light most favorable to her, to survive summary judgment. *Id.* at 928-29. The commissioners' comments during Geraty's interview, and their explanation for their evaluation of her performance, suggested that they "'relied on sex stereotypes in making the employment decision.'" *Id.* (quoting *Bruno*, 950 F.2d at 362). Also, the court concluded that there was "ample evidence that Geraty was better qualified" than some of the "male officers who scored higher than she did on the interview." *Id.* at 930.

### c. *Price Waterhouse and Geraty are distinguishable*

Unlike the partners' comments in *Price Waterhouse*, Truesdale did not explicitly link his criticism of Hussain's performance during GFT hearings to her gender. In lieu of more pointed statements, Hussain attempts to use evidence relating to other employees to bolster the inference that Truesdale expected her to conform to stereotypes. Mazique testified that "in some cases" she felt that her suggestions were viewed as "aggressive," because they were "not presented by a male peer." R. 107-15 (Mazique Dep.) at 75-76. This testimony is vague and conclusory, and she appeared to concede during her deposition that she did not have a foundation for her suspicions. *Id.* at 76 (Q. "Were men—you know, if a man made a suggestion, was he characterized as being aggressive?" A. "That, I don't know."). Hussain testified somewhat more concretely that on one occasion Truesdale characterized the disciplinary action of Hussain's male peer as "enough," but characterized the same action by Hussain as "overkill." *See* R. 127 ¶ 34; R. 107-2 (Hussain Dep.) at 176-77. But this incident occurred in early 2012, *see* R. 107-2 (Hussain Dep.) at 176-77, more than a year after Truesdale hired Griffith for the GYY-PM position.

FedEx acknowledges that Truesdale's statement about Native Americans was inappropriate. At the same time, his statement does little to bolster Hussain's discrimination claim. Truesdale told Hussain that she should be "stoic and not let people see what [you are] feeling," like stereotypical depictions of Native Americans. R. 126 ¶ 24. Hussain's attempt to link stoicism with submissiveness is

unpersuasive. *Cf.* R. 116 at 13 ("These stereotypical comments demonstrate that Truesdale desired Plaintiff to conform to the stereotype of a submissive Indian female."). Her typewritten notes of their meeting indicate that Truesdale praised her for being "focused," "very decisive, and not afraid of confrontation." R. 118-19 at 2. Truesdale may have been wrong that Hussain was "aggressive," and—at least as described in Hussain's notes—the distinction he attempted to draw between "aggressive" and "assertive" is elusive. *See id.* at 3. But the evidence does not support the inference that he did not promote Hussain because she is Indian.

The facts in *Geraty* are closer to this case, but still distinguishable. There is no evidence in the record that Truesdale discouraged Hussain from applying for promotion because of her gender and/or national origin. *Cf. Geraty*, 941 F.Supp.2d at 922. On the contrary, he encouraged her to apply for Senior Manager positions. R. 117 ¶ 42. And unlike *Geraty*, the record in this case does not support the conclusion that the other candidates for the GYY-PM position were unqualified. *Cf. Geraty*, 941 F.Supp.2d at 924 (fellow officers testified that Jensen was "barely adequate" as a patrol officer, "not a hard worker," disrespectful, and "unqualified to be sergeant"). So, there is nothing inherently suspicious about the fact that Phillips, Griffith, and Smith received higher scores than Hussain. Likewise, Hussain has not identified any outlier scores suggesting that the panelists were motivated by something other than the candidates' performance.

### 4. Summary

Truesdale's track record of not promoting female Operations Managers to Senior Manager, and Thompson's EEO complaint against him, is some evidence that he harbored discriminatory attitudes about women. The details of the GYY-PM interview process, however, undermine any inference of discrimination that a reasonable jury might draw from that evidence. Viewing the record as a whole in the light most favorable to Hussain, she has not presented convincing circumstantial evidence that would allow a reasonable jury to find that FedEx did not promote her because she is an Indian woman.

## B. Indirect Method of Proof

Under the indirect method, Hussain must first establish a *prima facie* case consisting of four elements: (1) she was a member of a protected class; (2) she applied for an open position for which she was qualified; (3) she did not receive the position; and (4) the person who was hired was not in the protected class and had similar or lesser qualifications. *See Whitfield*, 755 F.3d at 444. If Hussain establishes a *prima facie* case, then the burden shifts to FedEx to articulate a legitimate nondiscriminatory for its decision not to promote her. *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 680 (7th Cir. 2015). If it does so, then Hussain must show that FedEx's explanation was pretext. *Id*.

### 1. *Prima Facie* Case

The parties dispute whether Hussain has satisfied the fourth element of her *prima facie* case. Griffith and Hussain had comparable qualifications going into

their interviews. *See infra.* As Hussain admits, however, "FedEx's normal employment practice was to hire the candidate who received the highest interview score for the position." R. 126 ¶ 22. So, an employee's interview score relative to another candidate is a relevant qualification for the position.[18] *See Murray v. Golden Rule Ins. Co./United Health Corp.*, 23 F.Supp.3d 938, 951-52 (S.D. Ind. 2014) ("interview performance" is a relevant qualification for purposes of evaluating whether the plaintiff has made a *prima facie* case); *see also Armstrong v. City of Milwaukee*, 204 Fed. Appx. 559, 561-63 (7th Cir. Nov. 6, 2006) (addressing the plaintiff's poor interview performance in the context of his *prima facie* case). Hussain emphasizes the fact that Truesdale considered other factors besides the candidates' scores. *See* R. 126 ¶ 22. It does not follow, however, that interview scores are unimportant.[19] In order to award the position to Hussain, FedEx would have had to pass over three higher scoring candidates (Phillips, Griffith, and

---

[18] Hussain argues that the interview score is an improper consideration because it allows the employer to shield discrimination behind a "sham interview with sham scoring." R. 116 at 15. The Seventh Circuit has rejected the argument that subjective evaluations are inherently suspect. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002). If Hussain had established a material factual dispute about whether the interview process was biased, then FedEx could not rely on the interview scores to support its employment decision. But she has not done so for reasons the Court has already discussed.

[19] Hussain's reliance on *Bickhem v. United Parcel Service,* 949 F. Supp. 630 (N.D. Ill. 1996) is misplaced. The defendant in that case argued that it legitimately considered the plaintiff's score on a sales assessment test in awarding the position to a higher-scoring candidate. *Id.* at 636. The "record [was] clear," however, "that defendant *did not rely on these scores* in its promotion decision. In fact, plaintiff did not even take the test until after [the other candidate] was promoted." *Id.* (emphasis added).

Smith). There is no evidence in the record that FedEx has ever departed from the interview rankings to such a degree. Given the admitted weight that FedEx gives to interview performance, Hussain was not as qualified for the position as Griffith.

## 2.    Pretext

Even if Hussain had established a *prima facie* case of discrimination, FedEx has articulated legitimate, nondiscriminatory reasons for its decision: (1) Malone told Truesdale that Phillips was not ready for a Senior Manager position at a large station; (2) Griffith had the next highest score after Phillips; (3) Griffith had p.m.-shift experience at a large facility; and (4) Griffith was African American. R. 117 ¶¶ 37-40. In order to show that this explanation is pretext, Hussain must show that "her credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005) (quoting *Millbrook*, 280 F.3d at 1181). Truesdale did not give Phillips the job because Phillips's Managing Director told Truesdale that Phillips wasn't ready. Consistent with FedEx's emphasis on interview performance, Truesdale promoted the next highest-scoring candidate. With respect to their other credentials, Griffith and Hussain were comparable. Griffith had a few more months of overall management experience than Hussain, and had more experience working a p.m. shift. *See* R. 117 ¶ 52. Hussain had an MBA, R. 126 ¶ 2, whereas Griffith had only a bachelor's degree in business administration. R. 117 ¶ 52. But FedEx does not require Senior Managers to have

any college degree, *id*. ¶ 49, and the lowest scoring candidate—Wallace Loney—also had an MBA. *Id*. ¶ 50. Hussain's credentials were not so superior to Griffith's that no reasonable person could have selected him for the position over her.

Hussain has failed to establish a triable issue regarding her failure-to-promote claim using the indirect method.

## II. BZ Bonuses

Hussain's claim that Truesdale distributed BZ bonuses in a discriminatory manner is based entirely on hearsay. *See* R. 117 ¶¶ 74-75; R. 126 ¶ 36. FedEx objected on that ground in its opening summary-judgment brief, *see* R. 106 at 11, but Hussain did not address the issue in her response. *See* R. 116. She also did not address FedEx's argument that failing receive a discretionary bonus—or, in this case, receiving a lower bonus than other employees—is not a material adverse action under Title VII. *See* R. 106 at 12 (citing *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996)). The Court concludes that Hussain has waived any claim that she might have made based upon her BZ bonus. Even if she had not waived her claim, she has not cited any admissible evidence to support it.

## CONCLUSION

For the foregoing reasons, the Court grants FedEx's motion for summary judgment, R. 105.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: August 10, 2015